**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA

          -v-                               5:25-CR-214 (AJB)

JOHN BURGOS,

          Defendant.

---

**Hon. Anthony Brindisi, U.S. District Judge:**

**<u>DECISION and ORDER</u>**

## I.      INTRODUCTION

The United States of America (the "government") has indicted defendant John Burgos for possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g). Dkt. No. 1. Burgos has moved to suppress all evidence obtained during the operation preceding his arrest, including a gun, or in the alternative for an evidentiary hearing. Dkt. No. 17.

The motion is fully briefed, Dkt. Nos. 17-1 ("MTS"), 19 ("Gov't Mem."), 22 ("Def. Reply"), and will be considered based on the parties' submissions without oral argument.

## II.      BACKGROUND

In 2022, Burgos pleaded guilty in Supreme Court, Onondaga County, to third-degree robbery, an offense that involved using a gun and threatening to "shoot up" his victim's house. *See* Gov't Mem. at 1. On October 24, 2024, after serving about half of a four-year custodial

sentence, Burgos was released on state parole with a term originally set to expire in March 2026. *Id.*; Dkt. No. 17-4 ("Rel. Cert.") at 2.

As part of Burgos's parole, he agreed to various conditions of supervision. Rel. Cert. at 2–4. Among others, these included the following ("Condition Four"):

> I will permit my Parole Officer to visit me at my residence, will permit the search and inspection of my person, residence and property, and will discuss any proposed changes in my residence, employment or program status with my Parole Office.

*Id.* at 3. The government claims that, by the spring of 2025, Burgos had violated various terms of his parole agreement more than two dozen times. *See* Gov't Mem. at 2.

On March 27, 2025, the Syracuse Police Department ("SPD") learned of a robbery at gunpoint at a gas station. Gov't Mem. at 2. Sometime later, SPD learned of a second robbery involving a foot chase. *Id.* On March 28, 2025, SPD identified Burgos as a person of interest in at least the former incident, which, it bears repeating—like the robbery to which Burgos had pleaded guilty—involved a gun. MTS at 2. An SPD officer shared this information with the parole officers responsible for supervising Burgos, but no warrant for his arrest was issued. *Id.*

Nevertheless, by April 16, 2025, SPD wanted to question Burgos in connection with the March robberies. Gov't Mem. at 2. On that date, SPD and parole officials were conducting a joint operation to "check on" parolees subject to location monitoring, a group that included Burgos. *Id.* Officials determined that Burgos was in or near Teall Market, a convenience store in Syracuse, and traveled to his location. *Id.*

Although the parties interpret the events that followed differently, their retellings largely align.[1]  SPD Officers Leonard Brown and Darrin Ettinger arrived at Teall Market in a police vehicle, dressed in police uniforms, and entered the store.  MTS at 3; Gov't Mem. at 2.  Officer Brown saw Burgos in an aisle and, within moments, tackled him.  MTS at 3; Gov't Mem. at 3.  While both officers manually restrained Burgos on the ground, Officer Ettinger checked Burgos for weapons and found a gun in his pants.  MTS at 4; Gov't Mem. at 3.

The parties disagree, however, about why Officer Brown tackled Burgos.  Burgos seems to suggest that the SPD officers used force on him because of his race.[2]  *See* MTS at 3.  On the other hand, the government points to Burgos's movements just before Officer Brown tackled him, noting that, "[u]pon seeing the officers, the defendant began reaching towards his pocket/waistband."  Gov't Mem. at 2–3.  Based on this gesture and Officer Brown's knowledge that Burgos was both (1) on parole after pleading guilty to a crime involving a gun, and (2) wanted for questioning in connection with at least one additional, more recent incident involving a gun, the government writes, "Officer Brown believed that the defendant may be armed and reaching for a firearm."  *Id.* at 7.  In response, Burgos has attested that "[he] didn't reach towards [his] front pocket or waistband" at that time.  Dkt. No. 22-1.

Burgos has submitted body-worn camera footage of the events inside Teall Market.  *See generally* Dkt. No. 17, Ex. D.  The parties disagree about whether the footage shows Burgos

---

[1] As the government claims, "[t]he facts surrounding the stop and search are not in dispute."  Gov't Mem. at 2.

[2] Burgos's motion includes several hyperlinked local news articles reporting that Officers Brown and Ettinger have each "been accused of using excessive force on people of color."  MTS at 3.  His reply brief repeats these claims.  Def. Reply at 8 ("As noted in the moving papers, [Officers] Brown and Ettinger have previously been accused of using excessive force on people of color.").

reaching toward his waistband.[3]  Notwithstanding the footage, in a written report on the incident,

which Burgos also submitted with his motion, Officer Brown detailed his assessment that Burgos

had begun to reach toward what he believed could have been a gun.  Dkt. No. 17-8.

Officer Brown's narrative reads, in part:

> Upon entering the store I immediately saw Burgos standing in one
> of the [a]isles near the front.  It should be noted that for this detail
> we were wearing plain clothes with vests that are clearly marked
> police along with other items that would clearly indicate we are the
> police.  It should also be noted that upon seeing us enter the store it
> appeared to me that our presence made Burgos highly nervous.
> Upon seeing us Burgos['s] eyes opened up wide and he began
> making movements towards the waistband of the pants he was
> wearing at that time.  Burgos also began reaching into the front right
> pocket of the jacket he was wearing in [a] manner that made me
> believe he could be reaching for an object that I could not see.  It
> should be noted that [in] the robbery incident involving Burgos that
> [another officer] is investigating, Burgos is accused of being armed
> with a handgun.  It should also be noted that Burgos was charged for
> being in possession of a handgun for the incident that resulted in
> hi[s] being placed on parole.  *Based on the above-mentioned actions,*
> *along with the furtive movements I saw Burgos making, I did believe*
> *he may be armed with a firearm.*  Based on this belief I did
> immediately force Burgos to the ground . . . .

Dkt. No. 17-8 at 6 (emphasis added).  Officer Ettinger's report, which Burgos also appended to

his motion, likewise indicates that officers thought Burgos was likely armed.  *See id.* at 15 ("[O]n

---

[3] In reference to the footage, Burgos describes the events as "unfolding extremely quickly," noting that Officers
Brown and Ettinger ran at him "[i]mmediately upon entering the store, without pausing," Officer Brown tackled
him, the officers restrained him, and Officer Ettinger "shoved his hand down the front of [his] pants," where he
found a gun.  MTS at 4.  In reference to the same footage, the government says that "[u]on seeing the officers"
Burgos began to move a hand toward his waist, Gov't Reply at 2–3, and that the motion "[was] clearly visible," *id.*
at 7.  The government attaches screenshots purporting to show the same.  Dkt. Nos. 19-1, 19-2, 19-3.

The parties' characterizations aside, the Court has reviewed the footage and concludes that nothing therein indicates
that any material fact in this case is genuinely in dispute.  *See Scott v. Harris*, 550 U.S. 372 (2007) (holding courts
should consider video evidence constituting part of record in assessing existence of genuine material issues of fact).
Thus, as discussed below, the footage does not aid Burgos in establishing that an evidentiary hearing is required.

top of Burgos['s] being on parole for [criminal possession of a weapon], we were also aware . . .

that he was wanted for a recent armed robbery[.]").

In any event, after recovering the gun, the officers took Burgos outside to a patrol car.

MTS at 4.  State authorities charged him with criminal possession of a weapon and resisting

arrest, *id.*, and a federal grand jury later returned an indictment for possession of a firearm by a

prohibited person, Dkt. No. 1.

On August 22, 2025, Burgos appeared before U.S. Magistrate Judge Thérèse Wiley

Dancks, who appointed the Office of the Federal Public Defender to represent him.  Dkt., Text

Minute Entry (Aug. 22, 2025).

Burgos filed the pending motion on October 27, 2025.  MTS.  The government responded

on November 17, 2025, Gov't Mem., and Burgos replied on December 1, 2025, Def. Reply.

## III.    LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. AMEND.

IV.  In general, a search performed without a warrant issued upon a showing of probable cause is

*per se* unreasonable.  *See Katz v. United States*, 389 U.S. 347, 356–57 (1967).  But "the warrant

requirement is subject to certain reasonable exceptions."  *Kentucky v. King*, 563 U.S. 452, 459

(2011).  To justify a warrantless search, the government must show that an exception applies.

*See United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018).

## IV.    DISCUSSION

As an initial matter, the Court writes to clarify the parties' respective burdens.  A criminal

defendant bears the burden of "demonstrating disputed issues of fact that would justify an

evidentiary hearing" using "an affidavit from an individual with personal knowledge of the

underlying facts." *United States v. Diaz*, 303 F. Supp. 2d 84, 93 (D. Conn. 2004).  Where "no

contested issues of fact going to the validity of the search" would justify an evidentiary hearing,

however, no hearing is required.  *See United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992).

Broadly speaking, Burgos's moving papers contain an affidavit that oulines his

perceptions of the SPD officers' and his parole officer's actions relating to his arrest.  *See* Dkt.

No. 17-2.  His initial papers also include, among other things, police reports and body-worn

camera footage from the operation.  Dkt. No. 17, Exs. D & E.  In a subsequent affidavit, Burgos

explains that he did not, in fact, reach toward his waistband inside Teall Market.  *See* Dkt. No.

22-1.  The Court may examine all of these submissions in evaluating whether Burgos has carried

his burden.  *See, e.g.*, *United States v. Suggs*, 2021 WL 1601120, at *2 n.5 (D. Conn. Apr. 23,

2021) (describing shifting burdens in motion to suppress context).

To defeat suppression, the government must show by a preponderance of the evidence

that there was a lawful basis for a search and/or seizure.  *See, e.g.*, *United States v. Zayas*, 2022

WL 16737223, at *3 (S.D.N.Y. Nov. 7, 2022) (citing *United States v. Delossantos*, 536 F.3d 155,

158 (2d Cir. 2008) and *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974)).

Since in this case SPD officers acted without a warrant, the parties focus their arguments

on exceptions to the warrant requirement.  Burgos contends that neither the search-incident-to-

arrest nor parole-search doctrines provides a legal basis for SPD's actions.  *See* MTS at 5–7.  In

response, the government argues that the search was justifiable under either of those exceptions,

the exigent circumstances doctrine, or *Terry v. Ohio*, 392 U.S. 1 (1978), and its progeny.  Gov't

Mem. at 4–7.  For reasons that will become clear, the Court begins with *Terry*.

A.      *Terry v. Ohio*

In *Terry*, the Supreme Court held that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous," it is reasonable under the Fourth Amendment "to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." 392 U.S. at 24. The stop-and-frisk procedure authorized in that case has come to be known as a "*Terry* stop." *See, e.g.*, *United States v. Rhodes*, 2025 WL 1797284, *3 (S.D.N.Y. June 26, 2025) (characterizing "typical *Terry* stop" as entailing "a brief seizure and limited search" (emphases omitted)).

To conduct a *Terry* stop, an officer needs only reasonable suspicion, a less exacting standard than probable cause. *See, e.g.*, *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (explaining that under *Terry* police may detain and pat down individuals even without probable cause to arrest). The Supreme Court has described reasonable suspicion as a "'particularized and objective basis' for suspecting legal wrongdoing," based on the totality of the circumstances. *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). An officer may determine that reasonable suspicion exists by drawing inferences from his present knowledge, his perceptions, and "[his] own experience and specialized training." *Id.*

Here, Officer Brown plainly had reasonable suspicion that Burgos was armed and dangerous. Officer Brown's report establishes that he was aware of Burgos's relevant criminal history, including that Burgos had pleaded guilty to one armed robbery and was a suspect in

another.  Dkt. No. 17-8 at 6.[4]  That was not all.  Burgos also reacted to SPD's arrival at Teall

Market with what Officer Brown perceived as a "highly nervous" response, including by almost

immediately beginning to motion toward his waistband and front jacket pocket in a way that

"made [Officer Brown] believe he could be reaching for an object that [Officer Brown] could not

see."  *Id.*; *United States v. Hagood*, 78 F.4th 570, 578 (2d Cir. 2023) (holding consideration of

suspect's perceived nervousness was valid part of officer's reasonable-suspicion analysis and

collecting cases); *Zayas*, 2022 WL 16737223, at *9 (holding same).  Taken together, these factors

amounted to a "particularized and objective basis" for suspicion.  *See Arvizu*, 534 U.S. at 273.

As such, concluding that Burgos was likely armed and dangerous, and then conducting a *Terry*

stop, was reasonable under the circumstances.  *See Rhodes*, 2025 WL 1797284, at *5 (finding

defendant's criminal history and perceived movements around waistband, *inter alia*, created

reasonable suspicion).

　　　　Once an officer has reasonable suspicion, "the law recognizes the 'important need to

allow authorities to graduate their responses to the demands of any particular situation.'"  *United*

*States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) (quoting *United States v. Sharpe*, 470 U.S.

675, 686 (1985)).  "Thus, where an officer has a reasonable basis to think that [a] person . . .

poses a present physical threat to the officer or others, the Fourth Amendment permits the officer

to take 'necessary measures . . . to neutralize the threat' without converting a reasonable stop into

a *de facto* arrest.'"  *Id.* (quoting *Terry*, 392 U.S. at 24, and collecting cases).

　　　　Therefore, "[a]lthough 'under ordinary circumstances, drawing weapons and using

handcuffs are not part of a *Terry* stop, intrusive and aggressive police conduct' is not an arrest

---

[4] The Court would consider the combination of a prior conviction and being sought for questioning in connection with a more recent armed robbery sufficient to establish reasonable suspicion.  But, as discussed *infra*, Officer Brown had more, since—on top of these factors—Officer Brown also relied on his interpretations of Burgos's physical response to police's presence in the corner store to determine that a stop was warranted.

'when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." *United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) (quoting *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001) (alterations adopted)).

In this manner, *United States v. Rhodes* proves instructive.  There, the court denied a motion to suppress, concluding police had obtained the disputed evidence, a gun, as the result of a lawful—if atypically intrusive—*Terry* stop.  *See* 2025 WL 1797284, at *3.  While surveilling a Manhattan intersection, an officer had spotted the defendant, who had previously pleaded guilty to attempted criminal possession of a weapon and who could not lawfully possess guns.  *Id.* at *1.  During the surveillance, the officer "observed [the defendant] move in a way that suggested he was carrying a firearm," including by holding a hand to his waistband.  *Id.*  Based on his perceptions, "his knowledge of [the defendant's] criminal history," and his awareness of previous incidents involving guns in the same area, the officer concluded the defendant was armed.  *Id.* at *2.  Accordingly, that officer instructed others to locate the defendant and investigate whether he had a gun.  *Id.*  A different officer tracked the defendant to a corner store where bystanders were present, approached him, and told him to remain calm.  *Id.*  The defendant then "lowered [a] hand . . . toward his side," brushing against the officer, who "proceeded to force [the defendant] to the ground," after which he found a gun in the defendant's waistband.  *Id.*

The *Rhodes* court noted that the officer who tackled the defendant had entered the corner store "specifically intending to effectuate a *Terry* stop . . . because . . . he had reasonable

articulable suspicion that [the defendant] was armed." 2025 WL 1797284, at *4.[5] And since the officer reasonably believed the defendant was armed, his actions were appropriate to ensure both his and the public's safety, regardless of probable cause. *Id.* (citing *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990)). The court summarized the sequence of events as follows: the officer developed reasonable suspicion, "br[ought] [the defendant] to the ground to subdue him ahead of a pat down for weapons," which revealed a gun, which in turn provided "probable cause to arrest [him] for being a felon in possession." *Id.* So, "[w]hile perhaps more intrusive than the average *Terry* stop," the officer's actions were reasonable under the circumstances. *Id.*

The same must be said regarding SPD's actions in this case. Once Officer Brown had reasonable suspicion, he could conduct a *Terry* stop. *Arvizu*, 534 U.S. at 273; *Bailey*, 743 F.3d at 332. The Fourth Amendment permits such stops in response to officers' reasonable assessments of defendants' threats to public safety. *See Vargas*, 369 F.3d at 102. This remains true even when a *Terry* stop is "perhaps more intrusive" than usual. *Rhodes*, 2025 WL 1797284, at *4. Under these circumstances, the brief use of nonlethal force against someone reasonably believed to be armed and dangerous, in a public place with bystanders present, and then conducting a limited frisk for weapons, was entirely appropriate to "neutralize the threat" that officers had reasonably concluded the individual posed. *See Newton*, 369 F.3d at 674.

Furthermore, like the police in *Rhodes*, Officers Brown and Ettinger "br[ought] [the defendant] to the ground to subdue him ahead of a pat down for weapons[,] . . . in the process . . .

---

[5] Writing separately to assess reasonable suspicion, the court held that the officer who had been surveilling the intersection had appropriately concluded that the defendant had a gun, "based on numerous factors, including his observation of [the defendant's] movements, his knowledge of [the defendant's] prior arrests, and his understanding that the intersection . . . was a high-crime area," drawing on past police experience. *Rhodes*, 2025 WL 1797284, at *5. And even though the defendant later identified some factual errors in the complaint filed in support of his arrest, including the location of a different gun recovered from the same defendant during a previous arrest, the fact "[t]hat [the officer] may have been mistaken about some of the details . . . [did] not undercut his reasonable suspicion because the touchstone is whether the mistake was reasonable." *Id.*

discovered [the defendant] was armed," and so "had probable cause to arrest [him] for being a felon in possession."  2025 WL 1797284, at *4.

Thus, Burgos's arguments about whether and/or when SPD effectuated a *de facto* arrest without probable cause, Def. Reply at 5–7, miss the mark.  Officer Brown's initial response was a valid *Terry* stop based on reasonable suspicion.  Once Officer Ettinger found a gun on Burgos's person, this reasonable suspicion developed into probable cause, given officers' awareness of Burgos's status as an individual prohibited from possessing such weapons.  And the Fourth Amendment plainly does not require warrants for arrests based on crimes committed in officers' presence.  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

While *Terry* does not permit limitless incursions into defendants' personal spaces, the events in this case did not encroach upon Burgos's Fourth Amendment rights.  Even aside from any probable cause that ultimately resulted, seizing the gun was permissible under *Terry*: given not only Burgos's past conviction for and suspected involvement in separate armed robberies, but also what Officer Brown reasonably perceived to be a potentially threatening response to SPD's arrival on the scene, Officer Brown reasonably believed Burgos was armed and dangerous.  Once Officer Brown made the stop on that basis, Officer Ettinger's frisk of Burgos's pants was appropriate to ensure both police's and the public's safety.

Therefore, the motion to suppress must be denied.

### B.    Parole Search

While evaluating the motion requires no further analysis, the Court considers the parties' arguments about the parole-search exception as an alternate basis for a decision.  For his part,

Burgos argues that this exception does not apply because the relevant language in his parole

agreement, Condition Four, did not provide consent to warrantless searches by people other than

parole officers.  MTS at 6.  The government responds that the law in our circuit allows for

warrantless searches of parolees by other law enforcement officials who are cooperating with

parole officers.  Gov't Mem. at 6.

Broadly speaking, the Fourth Amendment allows some warrantless searches of

individuals who have been released from custody but remain subject to government supervision.

*See, e.g.*, *Griffin v. Wisconsin*, 483 U.S. 868, 873–74 (1987).  Thus, a parole officer may search a

parolee without a warrant—and without even reasonable suspicion—when parole is expressly

conditioned upon the parolee's submitting to such searches.  *Samson v. California*, 47 U.S. 843,

855 (2006) (upholding state parole system providing for such searches and observing parolees

have "substantially diminished expectation[s] of privacy").  The Second Circuit has added a

gloss to *Samson*, approving of a suspicionless search of a parolee that is "reasonably related to

the parole officer's duties."  *United States v. Braggs*, 5 F.4th 183, 186–87 (2d Cir. 2021).

The facts of this case do not fit neatly into these categories.[6] Assuming that Condition

Four intended to authorize only parole officers' warrantless searches, *see* MTD at 6–7, the Court

confronts the fact that the relevant actors here were not parole officers, but police officers who

were engaged in a joint operation with a parole officer.  Gov't Mem. at 2.  This matters because,

---

[6] The text of Condition Four is no model of clarity.  *See* Rel. Cert. at 3 ("I will permit my Parole Officer to visit me at my residence, will permit the search and inspection of my person, residence and property, and will discuss any proposed changes in my residence, employment or program status with my Parole Office," a term the Court interprets to encompass "parole officer").  It obligates Burgos to "permit *[his] Parole Officer* to visit [him] at [his] residence," to "discuss any proposed changes in [his] residence, employment, or program status *with [his] Parole Office*" and to "permit *the* search and inspection of [his] person, residence, and property."  *Id.* (emphases added). The last of these clauses—located between the other two in the original—does not identify what person or category of people may conduct such "search[es] and inspection[s]."  *Id.*  One reading could put any law enforcement official, including police officers, into that group, given the clause's apparent breadth compared to its more specific neighbors.  But another could reason that, because the surrounding clauses refer to parole officers, non-parole law enforcement officials fall beyond its scope.

while the Fourth Amendment permits a great deal of police-parole cooperation, in our circuit the outer boundaries of this area of law are somewhat hazy.

The government correctly quotes the Second Circuit as having approved of "cooperation between probation officers and other law enforcement officials so that they may work together and share information to achieve their objectives."  Gov't Mem. at 6 (quoting *United States v. Reyes*, 283 F.3d 446, 471 (2d Cir. 2002) (quotations omitted)).  Based on this holding, the government argues, "[p]arole was lawfully permitted to stop and search [Burgos], and they were allowed to enlist SPD to assist, especially given the defendant's dangerous history."  *Id.*  This much is not self-evident.

The *Reyes* panel collapsed the distinction between probation officers and parole officers as relevant here.  283 F.3d at 458–61 (discussing "probation/parole officer's observation and supervision responsibilities," including, among other things, enforcing supervision conditions and preventing new criminal activity); *see also Black v. Petitinato*, 761 F. App'x 18, 21–22 (2d Cir. 2019) (summary order) ("We have held that police officers may coordinate with parole officers to conduct a search of a parolee's home.") (citing *Reyes*, 283 F.3d at 464).  And the panel firmly rejected the idea that the Fourth Amendment prohibits collaboration between police and probation or parole officers designed to facilitate warrantless searches, known as the "stalking horse" theory.  *Reyes*, 283 F.3d at 463; *see also United States v. Chandler*, 56 F.4th 27, 44 (2d Cir. 2022) (reaffirming *Reyes* and sanctioning joint police-probation effort to observe and search defendant suspected of engaging in repeated drug dealing), *cert. denied*, 143 S.Ct. 1791 (2023).

But cases blessing warrantless interagency searches have appeared to involve a level of collaboration that the available record in this case does not make clear.  In *Reyes*, for example, a Drug Enforcement Agency ("DEA") officer had asked federal probation officers to coordinate a

home visit of a probationer to coincide with DEA's planned search of a neighboring home; DEA, federal probation, and local police officers traveled together to the two homes; and both DEA and federal probation officers searched the probationer's home, even as the DEA officers took the lead on the more invasive parts of the search.  283 F.3d at 451–53.  In *Chandler*, after a federal probation officer received a tip regarding a probationer's alleged possession of a prohibited gun, the federal probation officer and local police officers together conducted a planned search of the probationer's residence.  56 F.4th at 32.  And in *Black* (a civil case in a different procedural posture), "the parole officers [who had searched the plaintiff suing under 42 U.S.C. § 1983] were accompanied in their search by police officers."  761 F. App'x 18 at 21.

Here, it is unclear whether there was such close interagency collaboration.  The record shows that, in an application for a warrant to search Burgos's phone after his arrest, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent Jacob Garrett describes "a NYSPO Supervision detail in Syracuse, New York,"  involving ATF, SPD, parole, and Onondaga County Sheriff's Office personnel.  Dkt. No. 17-9 at 4–5.  A report from the parole agency states, "[o]n 4/16/2025 . . . members of [the New York State Department of Corrections and Community Supervision], Syracuse Police, and other law enforcement were working a joint GPS detail."  Dkt. No. 17-5 at 3.  Officer Brown describes his unit as having included one parole officer and three SPD officers, the latter "assist[ing] with . . . administer[ing] checks on parolee[s] who have been placed on GPS monitors," like Burgos.  Dkt. No. 17-8 at 6.  Officer Ettinger's account mirrors Officer Brown's.  *See id.* at 15 (describing "a multi-agency cooperation, where . . . we were detailed to stop and detain persons on parole and being monitored by GPS bracelet").

The available record does not establish the parole officer's contributions to the joint detail after Officers Brown and Ettinger learned of Burgos's location.  The Court can ascertain that

Officers Brown and Ettinger entered Teall Market, and only they were involved in tackling, restraining, and ultimately recovering the gun from Burgos. *See, e.g.*, MTS at 3; Gov't Mem. at 2–3. Neither SPD officer's report refers to any contemporaneous or subsequent actions the parole officer may have taken. Dkt. No. 17-5 at 6–7, 15–16. *But see* Dkt. 17-2 ¶ 14 (attestation that during this process Burgos saw no parole officer "until a few minutes after [he] had already been arrested and put in a patrol car"). Based on these somewhat limited facts, it is not readily apparent that the *Reyes* line of cases must dictate the outcome of the pending motion.[7]

Nevertheless, the parties should not understand this section to mean that the parole-search exception does not apply, or that these events for any other reason offend the Fourth Amendment. Rather, since SPD's actions were permissible under *Terry* and its progeny, the Court leaves the task of defining the outer boundaries of police-parole cooperation for another day.

## C.    Evidentiary Hearing

Finally, the Court turns to whether an evidentiary hearing is warranted in this case. It is not. Put briefly, Burgos has failed to carry his burden of establishing a genuinely disputed material fact, *i.e.*, one bearing on the question of whether Officer Brown reasonably perceived Burgos to be an armed-and-dangerous threat to public safety when confronted inside Teall Market. Therefore, his request for an evidentiary hearing will be denied.

"An evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact *going to the validity of the search* are in question." *United States v. Getto*, 729 F.3d 221, 226 n.6 (quoting *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157, 165 (2d Cir. 2008) (emphasis added, quotation marks omitted)). Thus, where

---

[7] Neither party has identified an intra-circuit case about police-parole cooperation mirroring these facts. *See* MTS at 6–7; Gov't Mem. at 4–6; Def. Reply at 2–4. Perhaps unsurprisingly, the Court has found no such case, either.

a defendant's claims would not require suppression, a district court may deny his request for an evidentiary hearing. *Id.*; *United States v. Lewis*, 62 F.4th 733, 741 (2d Cir. 2023) ("[A defendant's] entitlement to an evidentiary hearing . . . turn[s] on whether he establishe[s] that there [are] disputed factual issues going to the validity of the search."); *see also United States v. Almonte-Polanco*, 2023 WL 4246105, at *4 (2d. Cir. June 29, 2023) (summary order) (affirming denial of request for evidentiary hearing where record, which included video evidence, failed to reveal "genuinely contested issue of fact going to the validity of the search"); *United States v. Brito*, 771 F. Supp. 3d 157, 181 (E.D.N.Y. 2025) (denying motion for evidentiary hearing where even crediting defendant's version of disputed facts did not require suppression).

As discussed elsewhere in this decision, Burgos has submitted, among other things, affidavits on his own behalf, SPD reports, the terms of his parole, and body-worn camera footage. *See generally* Dkt. No. 17. Meanwhile, as Burgos points out, the government has not submitted any affidavits or declarations in support of its arguments. Def. Reply at 1; *cf.* Dkt. No. 19. Yet the government's failure to do so, by itself, does not entitle Burgos to a hearing.

In the affidavit submitted with Burgos's response papers, he attests: "On April 16, 2025, while I was inside Teall Market when multiple law enforcement officers entered and ran towards me, I didn't reach towards my front pocket or waistband." Dkt. No. 22-1. In Burgos's telling, against the government's contention that the SPD officers' actions were justified in part because they saw Burgos move in such a way, this creates a contested factual issue requiring an evidentiary hearing. *See* Def. Reply at 2. For the following reasons, however, this is not so.

No genuine, material factual dispute exists here because the relevant question is not whether Burgos gestured toward his pocket or waistband, which alone would not decide whether suppression is necessary, but whether police reasonably believed him to be armed and dangerous,

based on their knowledge, perceptions, and experience.  *See, e.g.*, *Arvizu*, 534 U.S. at 273.  In

answering this question, the Court must be "careful to evaluate the record 'from the perspective

of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Tracy v.*

*Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (quoting *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir.

2006)).  And it must "make allowance for the fact that police officers are often forced to make

split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about

the amount of force that is necessary in a particular situation."  *Id.* (quotations omitted).

Burgos's own submissions show that Officer Brown's actions were reasonable under the

circumstances.  Officer Brown's report details his understanding that Burgos was wanted for

questioning in connection with an armed robbery and on parole for an earlier gun-related crime.

*See* Dkt. No. 17-8 at 6.  The report recounts how, equipped with this background knowledge,

Officer Brown entered Teall Market, spotted Burgos, and saw him respond in a "highly nervous"

manner, which he perceived to entail Burgos's eyes widening and Burgos's reaching toward his

waistband and jacket pocket, where he may have been concealing a weapon.  *Id.*  Nothing in the

available record—not the body-worn camera footage, Burgos's affidavits, or anything else—

suggests that Officer Brown was unreasonable in concluding, in that moment, that Burgos was

armed and dangerous.  Instead, his perceptions were reasonable, and his response likewise.

So, while indeed "contested," whether Burgos in fact moved his hand in the manners

described does not "go[] to the validity of the search," especially considering all the other factors

that contributed to Officer Brown's assessment.  *Cf. Getto*, 729 F.3d at 226 n.6.  And the Court

can identify no other genuinely contested fact that would affect the suppression analysis.

Thus, an evidentiary hearing is unwarranted in this case.

### D.    Remaining Arguments

Before concluding, the Court briefly addresses the parties' remaining arguments. Because police recovered the gun from Burgos pursuant to a valid *Terry* stop (and because the Court has spilled enough ink on other collateral matters), the search-incident-to-arrest and/or exigency exceptions to the warrant requirement have no effect on the outcome of this motion and thus require no independent analysis.

## V.    CONCLUSION

The available record demonstrates not only that Burgos has failed to establish a disputed fact bearing on the suppression analysis, but also that SPD officers acted well within the limits of the Fourth Amendment in determining that Burgos was armed and dangerous inside Teall Market, stopping him, conducting a frisk for weapons, and ultimately seizing a gun. As such, the Court cannot conclude that either an evidentiary hearing or suppression is warranted in this case.

Therefore, it is hereby

**ORDERED** that Burgos's motion to suppress (Dkt. No. 17) is **DENIED.**

The Clerk of the Court is directed to terminate the pending motion and set a trial date.

**IT IS SO ORDERED.**

Dated:  January 13, 2026
    Utica, New York.

Anthony J. Brindisi
U.S. District Judge